JOYNRS, J.
James Steptoe by his will bequeathed to his son James C. Steptoe certain property and debts, ‘ ‘as a fund out of which” he was to pay the debts of the testator ; and gave him, for his own benefit, the residue thereof that might remain after payment of the debts. This was not a legacy upon condition of paying the debts of the testator. The bequest created a trust fund which James C. Steptoe was to apply to the payment of the testator’s debts, and the acceptance of the bequest imposed no obligation upon him beyond the value of the fund. To the extent, therefore, to which the deed of trust of James C. Steptoe provided for the payment of debts of James Steptoe, beyond the value of the said fund, it was voluntary, and consequently void as againt his creditors. It was valid, however, as against Thomas Steptoe, as the trustee and as the administrator of James C. Steptoe deceased, and he cannot, therefore, be held liable, in either character, for the amount paid by him, in pursuance of its provisions, upon the debts of James Steptoe deceased, though it exceeded the amount for which James C. Steptoe was bound. But as the payments thus made enured to the benL efit of the legatees and devisees of James Steptoe deceased, they are liable to ^refund to the creditors of said James C. Steptoe deceased the amount paid by him and by the trustee on the debts of paid James Steptoe deceased, over and above the value of the trust fund above mentioned.
Upon the death of James C. Steptoe, his quasi equity of redemption in the real estate conveyed by his deed of trust descended to his heirs at law'; and his quasi equity of redemption in the personal property and debts devolved upon his executors. Upon the renunciation of the executors and the qualification of the administrators with the will] annexed, the latter interest became vested in them. By the will of said James C. Steptoe, he directed his executors to sell his real estate for the payment of his debts, so that the equity of redemption in the real estate descended to the heirs subject to this trust, the execution of which devolved, under the statute, upon the administrators. When Thomas Steptoe, who was sole acting trustee and sole acting administrator, sold the trust property, after the death of James C. Steptoe, it became his duty to pay to himself, as trustee under the will, so much of the surplus money remaining after the payment of the debts secured by the deed as arose from the sales of real estate, and to pay to himself, as administrator, so much of the said surplus as arose from the sales of personal estate or the collection of debts. Upon well settled principles, the amount thus payable to himself, as administrator, was assets in his hands as such, for which his sureties were responsible. Morrow’s adm’r v. Peyton’s adm’r, 8 Leigh 54. There was no need of any election on his part to make the transfer in order to fix the liability o'f the sureties. It was his duty to make it, and he could not lawfully refuse to do so after the purposes of the deed were satisfied.
When the same person is the representative of two estates, one of which is debtor to the other, or when the *same person is representative of an estate and guardian of a legatee, the time at which the transfer of assets should be made will depend upon the condition of the debtor estate, and- the state of the administration. Accordingly, in such a case, the court will not shift the responsibility from one set of sureties to the other, without some act or declaration on the part of the representative indicating an intention to transfer the assets. Morrow’s adm’r v. Peyton’s adm’r, ubi supra; Myers v. Wade, 6 Rand. 444.
But this case does not fall within the reasons which governed those decisions, as may be seen by reference to the opinion of Judge Tucker, in the case first cited. And even if the balance due from Thomas Step-toe as trustee to himself as administrator should not be considered as transferred by intendment and operation of law, upon the close of the trust to his account as administrator, the same result, in effect, would be reached in another way. For, according to the decision in Morrow’s adm’r v. Peyton’s adm’r, he and his sureties, as administrator, would be liable for a devastavit for his failure to account as administrator for the money so due from himself.
And this liability of Thomas Steptoe as administrator, and of his sureties, does not merely embrace the balance of the personal fund actually in his hands as trustee, but embraces the whole amount of said fund for which he was liable upon a proper settlement of his accounts. If as trustee he *360 wasted any part of the personal estate which came to his hands, he became liable for it, and he and his sureties must account for it, upon the principles above mentioned.
It appears from the evidence, that after most of the slaves had been sold, Callohill Minnis, who attended the sale as agent for the widow Mrs. Catharine Steptoe, made a public announcement to the persons present, that enough ^property had been sold to pay the debts of said James C. Steptoe, and that some slaves would then be sold which the widow wished to purchase. He further stated that he would make one bid for her, and that if any person should bid over him, he would not make another bid. The evidence is, that he said: “We have sold,” &c. and “We will now sell,” &c. from which it might be inferred that he was speaking on behalf of Thomas Steptoe, the trustee. But this is not important. It was the duty of Thomas Step-toe to be present at the sale, and to superintend and control it; and we must presume that he was present and heard the announcement. The result was, that nobody would bid, and that Minnis purchased eight slaves successively at his first bid. ■ The eight were purchased for $645; whereas they had been appraised at $1,750, and would have produced $2,798, according to the estimate of the commissioner, founded on the prices which the other slaves brought, compared with what they were appraised at.
Now it is palpable that this ruinous sacrifice was brought about by the appeal which Minnis made on- behalf of the widow ; and equally so that it was done with the connivance, if not through the agency, of Thomas Steptoe. If he did not hear the announcement publicly made by Minnis, which we must suppose, considering the object of it, was so made that everybody present could and did hear it, did he not discover that nobody bid over Minnis, though his bid was far below the value, and that he bought at his own price? Did this excite no inquiry? Could he see this go on, again and again, as each slave was put up in succession, and not suspect that there was some contrivance to prevent a sale at fair prices. The truth is that he seems to have thought his duty fulfilled by obtaining money enough to pay the debts provided for in the deed, and to have felt himself at liberty to *favor his brother’s widow at the expense of all other persons, by conniving at the plan adopted by Minnis, if not by expressly assenting to it. This was a breach of trust, and a waste of a part of the trust property that had come to his hands. He was bound to make good the loss thus occasioned to the parties interested, and for that purpose was liable to be charged, in the settlement of his accounts, with the fair value of the slaves, instead of the price they were sold for. His claim to be exempted from the payment of interest cannot be allowed. Nothing short of a charge against him of the value of the slaves will indemnify the parties interested in the fund, and for the same reason that amount must bear interest as if the money had been received. This is the course always adopted by the court when a trustee has, by a breach of trust, wasted a part of the trust propertjr that has come to his hands. Hudson & als. v. Hudson’s adm’r, 5 Munf. 180; Miller v. Holcombe’s ex’or, 9 Gratt. 665; Miller & wife v. Jeffries, 4 Gratt. 472; Moore v. Hilton, 12 Leigh 1; 2 Lomax Executors 476; Hill on Trustees 522-3.
Six of the slaves thus sacrificed were purchased for Mrs. Steptoe, and two for her daughter Mrs. Burwell. The purchase was made at the instance and request of Mrs. Steptoe, and she took the slaves purchased for her. She knew the prices at which they were sold, and that they were very far below their real value; and it is a reasonable presumption that she was aware of the means by which her agent obtained them at such a sacrificed But whether that was so or not she accepted the benefit of the purchase and cannot repudiate the means by which her agent secured it for her. Crum v. United States Mining Co., 7 Gratt. 352. Having thus participated in the breach of trust, and reaped the benefit of it to the extent of the difference between the value of the six ^slaves purchased for her and the price she paid for them, she is liable, to that extent, to indemnify Thomas Step-toe and his sureties as administrator. Greenwood v. Wakeford, 1 Beav. R. 576; McGachen v. Dew, 15 Eng. L. & Eq. 97; Raby v. Ridehalgh, 1 Jurist N. S. 363; Barksdale v. Finney, 14 Gratt. 338; Lewin on Trusts (ed. 1858) 392; Ib. 768.
Mrs. Burwell for whom the other two slaves were purchased, appears to have been an infant at the time of the sale. But as no claim is made against her on account of that purchase, it is not necessary to say anything more in reference to it.
The decrees in favor of Donald and Mrs. Noble are not barred by the statute of limitations, because the decree of May, 1838, directed the commissioner to take an account of all the outstanding and unsatisfied debts of James C. Steptoe deceased, under which they had a right to come in and prove their debts; as they did. By that decree the court took upon itself the administration of the assets, and it would have restrained those parties from proceeding afterwards by a separate suit to enforce their claim. Stevenson v. Taverner, 9 Gratt. 398. The statute of limitations, therefore, ceased to run against them from the date ofthat decree. Stenndale v. Harkinson, 1 Sim. R. 393. If the bill in this case had been a “creditor’s bill,” filed on behalf of the plaintiff and all other creditors, perhaps the statute would have ceased to run from the filing of the bill, .as was held in the case last cited.
It appears from the accounts of Thomas Steptoe as trustee that the principal transactions of the trust were closed by the 1st day of January, 1832. The payments after that time were chiefly for expenses. But as it appears that there was a payment *361 upon a judgment in March, 1834, I think that the account should be ^stated upon the principle of an executor’s account, up to the 1st day of January, 1835. From that time it should be stated as an account between debtor and creditor, charging the disbursements against interest, and charging interest on the several sums received after the expiration of six months from the date of such receipt. In order to ascertain the proportion of the balance on the trust account, which is f to be regarded as arising from the real and personal funds, respectively, the debts paid under the deed should be apportioned ratably, according to the amount which came into the hands of the trustee from each fund, respectively.
The quasi equity of redemption in the real estate conveyed by the deed of trust is regarded in equity as an interest in the land (Downe v. Morris, 3 Hare’s R. 394, and cases cited), and as such descended to the heirs of James C. Steptoe, as I have already said. If he had died intestate, the money arising from that interest, being the surplus proceeds of the real estate after satisfying the deed, would have been applied ratably to the payment of debts of James C. Steptoe by specialty binding his heirs, according to the decision of this court in Jones v. Lackland, 2 Gratt. 81. But as the will of said James C. Steptoe charged his real estate with the payment of his debts, this fund is equitable assets, to be distributed among all the creditors ratably.
Whether the quasi equity of redemption in the personal property and debts conveyed by the deed of trust, is, in like manner, to be treated as equitable assets, or whether it is to be treated as legal assets and paid to the creditors according to the. dignity of their respective claims, is a question upon which there has been a diversity of opinion. As far as I am informed, this question has never been decided by this court. • By most of the text-writers it is laid down, that an equity of redemption *in personal property is equitable assets. The cases cited for that doctrine are, the case of Cox’s creditors, 3 P. Wms. 341; and Hartwell v. Chittiers, Ambl. R. 308. The latter case assigns no reasons, but only follows the former as an authority in point. Both arose upon mortgages of terms for years. It would be tedious to go into a detailed examination of the grounds on which the former case was put; and it is not necessary for the present purpose. The grounds of the decision, as reported, are deficient in clearness and precision, and have been declared by a learned writer to be “either unintelligible or impertinent.” In a note to this case, Mr. Cox refers to several previous cases in which it was held, that chattels, real or personal, mortgaged or pledged by the testator, and redeemed by the executor, are assets at law in the hands of the executor for so much as they are worth beyond the sum paid for their redemption, though recoverable only in equity. The law must be the same in respect to the equity of redemption, which is regarded as a substantial interest in the property, the mortgagee having a mere incumbrance, and redemption by the executor, even after forfeiture, being matter of right and not of favor. In the argument of Sharpe v. Earl of Scarborough, 4 Ves. R. 538, Sir John Mitford said, that the cases in P. Williams and Ambler had been considered as overruled. These cases were relied on by Bayley, J., in Clay v. Willis, 1 Barn. & Cres. 364 (8 Eng. C. L. R. 103), as one ground of his judgment. But the mortgage in that case was in fee, and the equity of redemption was clearly equitable assets upon the other ground relied on in the judgment, namely, the devise for the payment of debts. This judgment is cited by Lord Tenterden in Barker v. May, 9 B. & C. 489 (17 Eng. C. L. R. 426), but the fund in that case was the proceeds of real estate devised to be sold for the payment of debts *and legacies, and was, therefore, equitable assets. In a learned work published in 1832, it is said that the cases in P. Williams and Ambler are at variance with superior authority (alluding to the cases cited in Mr. Cox’s note), and with principle, too, and are of no value. Megginson on Assets in Equity 105. And Mr. Lewin regards them as of no authority in England at this day. Lewin on Trusts (ed. 1858).
There is much confusion and uncertainty in the books as to the criterion by which we are to distinguish whether assets are legal or equitable. In Eonblanque’s Equity the rule is stated to be, that assets which go to the executor qua executor, virtute officii, though only an equitable interest, or recoverable by the executor only in a court of equity, are legal assets. Eonb. Eq. 578. The same rule is laid down by Judge Story. 1 Story’s Eq- 1 551. This rule was adopted by Vice Chancellor Kindersley, in Cook v. Gregson, 2 Jurist, N. S. 510, and in French v. French, 3 lb. 482 and approved by Lords Campbell, Cran-worth, Chelmsford and Wenleysdale in Attorney General v. Bennwing, 6 Ib. 1083, decided by the House of Lords in 1860. It may, therefore, be considered as fully established in England.
In Cook v. Gregson, the vice chancellor said, that when it is laid down in the books that assets are equitable which are recoverable only in equity, the meaning is, not that they can only be recovered in equity by the executor, but that they can only be recovered in equity by a creditor seeking payment out of them. He says further, that if a court of law, trying an issue upon a plea of plene administravit, will say that the assets were not received by the defendant as executor, and will, not, therefore, take them into account, the creditor must resort to a court of equity to reach them, and they are equitable assets. ^Applying this criterion, there can be no doubt that an equity of redemption in personal property is legal assets. *362 The right of the mortgagee to the property, subject to the incumbrance of the mortgage, devolves upon his executor as such, by virtue of his office, and when the property is sold to satisfy the mortgage, he takes the surplus money in the same right. And accordingly, in Cook v. Gregson, above cited, the vice chancellor held an equity of redemption in personal chattels mortgaged by the testator to be legal assets in the hands of the executor. He expressed his disapprobation of the case of Cox’s creditors, which, of course, could not stand with his decision, unless a distinction be made between an equity of redemption in chattels real, and one in chattels personal.
The principal ground, if not the only one, upon which an equity of redemption in chattels mortgaged by the testator has been supposed to be equitable assets, is, that after forfeiture, the estate of the mortgagee is absolute at law, and' the mortgagee is driven into a court of equity.
But if any argument can be founded, in case of a mortgage, upon the fact that after forfeiture, the estate is absolute at law in the mortgagee, no such argument has any application to the case of a deed of trust.
In a deed of trust, though the legal title is in the trustee, his estate never becomes absolute, and the right of the debtor, or his executor, to redeem or to receive the sur-, plus after a sale is recognized by the character of the instrument, if not by its terms. I am therefore of opinion, that so much of the surplus of the trust fund as arose from the sales of personal estate and the collection of debts, must be ■ treated as legal assets in the hands of the administrator. I am aware that this view is in conflict with an opinion expressed by Judge Stanard in Jones v. Lackland, 2 Gratt. 81; but that opinion was *only a dictum, the question not being involved in the case.
Some other points will be embraced in the decree which need not be noticed in this opinion.
The decree of the Circuit court being inconsistent in several particulars, with the views I have expressed, I am of opinion that it should be reversed.
The other judges concurred in the opinion of J oynes, J.
The decree was as follows:
The court is of opinion that by accepting the bequest made to him by the will of his father James Steptoe deceased, James C. Steptoe became liable to pay the debts of the said James Steptoe deceased, only to the extent of the value of the fund bequeathed to him, and that the deed of trust of said James C. Steptoe in the proceedings mentioned, to the extent that it provides for the payment of debts of the said James Steptoe deceased, beyond the value of said fund, is voluntary and therefore void as against the creditors of the said James C. Steptoe. But the court is of opinion that the said deed of trust is valid against Thomas Steptoe as the trustee, and also as the administrator of | said James C. Steptoe, and that the creditors of said James C. Steptoe have a right to subject the legatees and devisees of said James Steptoe deceased, for so much as the debts of said James Steptoe deceased, paid by the said James C. Steptoe in his lifetime, or by the said Thomas Steptoe after his death, in pursuance of the provisions of said deed of trust, exceeds the value of the fund bequeathed as aforesaid by the said James Steptoe to the said James C. Step-toe. And as it will be necessary to recommit the accounts heretofore taken, the court is further of opinion that leave should be given to any of the parties to produce further ^evidence as to the amount of debts of said James Steptoe deceased so paid, or as to the value of said fund.
And the court is further of opinion that Thomas Steptoe in his character of administrator of James C. Steptoe deceased, and his sureties as such, are liable for so much of the balance that may be found due from said Thomas Steptoe a^ trustee, as arose from the sales of personal estate and the collection of debts conveyed and assigned by the deed, but the said sureties are not liable for so much of said balance as arose from the sales of real estate. And in order to ascertain the portions of such balance which consist of the proceeds of the real and personal funds respectively, the debts paid under the said deed should be apportioned between the said funds ratably.
And the court is further of opinion, that in the settlement of the accounts of said Thomas Steptoe as trustee, he should be charged with the fair value of the eight slaves 'purchased by Callohill Minnis for the defendants Catharine Steptoe and Francis Burwell, instead of the sum for which they were sold; and that interest should be charged thereon in the same way as if the said amount had been actually received.. And the court is further of opinion, that the said Catharine Steptoe is liable to indemnify the said Thomas Steptoe and his sureties as administrator, to the extent of the difference between the value of the six slaves purchased for her as aforesaid and the sum paid by her for them, with interest thereon; for which a decree may go against her in the first instance, if it can be done without subjecting the plaintiff and the other creditors of James C. Steptoe to undue inconvenience or delay, reserving the right to resort to the said Thomas Steptoe and his said sureties in case the decree against the said Catharine should prove unavailing in whole or in part.
And the court is further of opinion, that the account *of said Thomas Steptoe should be settled upon the principles applicable to the accounts of an executor, until the 1st day of January, 1835. And that from that time they should be settled upon the principles applicable to an account between debtor and creditor, charging the disbursements against interest as far as it will go, and charging interest upon the several sums received from the *363 expiration of six months after they were respectively received.
And the court is further of opinion, that so much of the balance of the trust fund in the hands of said Thomas Steptoe as arose from the sales of personal property and the collection of debts, should be treated as legal assets, and applied to the payment of the debts of James C. Steptoe according to their legal priorities as the law was at the time of his death ; and that so much thereof as arose from sales of real estate should be treated as equitable assets, and applied to the payment of the debts ratably and without regard to dignity, according to the principles applicable to equitable assets, &c.
Reversed, and sent back.